UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

―――――――――――――――――――――――――――――――
                                        )
RHODE ISLAND COUNCIL 94,                )
A.F.S.C.M.E., AFL-CIO, CINDY            )
PAQUIN, LINDA LOVEDAY, and NANCY        )
CARINHA,                                )
                                        )
              Plaintiffs,               )
                                        )
      v.                                )   C.A. No. 08-385 S
                                        )
STATE OF RHODE ISLAND, DONALD L.        )
CARCIERI, in his capacity as            )
Governor of the State of Rhode          )
Island, JEROME F. WILLIAMS,             )
in his capacity as Director of the      )
Department of Administration, FRANK     )
T. CAPRIO, in his capacity as           )
General Treasurer,                      )
                                        )
              Defendants.               )
―――――――――――――――――――――――――――――――

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

    In the midst of its most recent fiscal crisis, the
Defendant State of Rhode Island[1] sought to tighten its belt by
enacting legislation that reduced the amount the State would
spend on retiree health benefits.  At the center of this dispute
are amendments to R.I. Gen. Laws § 36-12-4 (LexisNexis Supp.
2009) (among others) (hereinafter "Article 4"), which went into

_____

    [1] Governor Donald Carcieri, General Treasurer Frank Caprio,
and Jerome Williams are also named as Defendants in their
official capacity.

effect on October 1, 2008.[2]  As further explained below, because the Court concludes that neither the Collective Bargaining Agreement ("CBA") nor the statute constitute a valid contract for retiree health benefits, for purposes of the constitutional claims here, Defendants' motion for summary judgment must be granted.

I.   **Factual and Procedural Background**

Plaintiffs initially filed suit in Rhode Island Superior Court and Defendants removed, pursuant to 28 U.S.C. § 1441.  See 28 U.S.C § 1331.  The parties cross-moved for summary judgment on Plaintiffs' claims for Declaratory Judgment and Injunctive Relief, and the claims that the changes to R.I. Gen. Laws §§ 36-12-4, 36-10-1 and 36-10-4 are unconstitutional violations of both the Rhode Island and the United States Constitution

---

[2] Plaintiffs' argue that the May 2008 passage of Article 4 is the operative date framing the legal issues here.  Plaintiffs rely upon this earlier date because Article 4 was passed by the General Assembly before the CBA was terminated.  For the purposes of analyzing the constitutional arguments presently before the Court, however, the critical date is the effective date of the legislation.  Since a un-enacted piece of legislation has no effect until it reaches its effective date and becomes law, Article 4 could only impair the CBA if the CBA's provisions survived into October. In other words, the mere passage of legislation by the legislature does not determine the critical point in time for a contract clause analysis, where the statute is set to go into effect at a future point in time when there is no longer a contract.  Because Plaintiffs dismissed their claims under the state collective bargaining laws (including breach of duty to negotiate and bargain in good faith), the Court need not consider whether the date of the passage of legislation has any significance as to those claims.

Contract Clauses (art. 1, § 12 and art. 1, § 10 respectively) and Takings Clauses (art. I, § 16 and Fifth Amendment respectively), and that Defendants are liable under theories of promissory estoppel and unjust enrichment.[3]

## A.   The CBA and state law prior to October 1, 2008.

Plaintiff is a labor organization and the certified collective bargaining representative of approximately 4,000 Rhode Island state employees.  Council 94 (and its predecessors) have been parties to continuous collective bargaining agreements with the State since at least 1972.  The CBA at issue was in effect from July 1, 2004, to June 30, 2008.  In May 2008, the legislation in issue was passed.  On June 16, 2008, Council 94 was notified that the agreement was being terminated and would not be renewed.  At issue is Article 45 of the CBA, which provides for specific levels of state contribution for retiree medical coverage and outlines when employees become eligible.

Article 45

RETIREE MEDICAL COVERAGE

45.1 The State and the Union have agreed that any employee covered by the contract that retires in accordance with R.I.G.L. 36-8-1 et seq. shall be able

---

[3] Defendants argue that Plaintiffs failure to invoke § 1983 is fatal to their claims.  However, the Court will construe the Complaint, which generally requests damages and attorney's fees in addition to declaratory and injunctive relief, as having plead a proper cause of action under 42 U.S.C. § 1983.  See, e.g., Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

to elect to receive employer paid individual medical coverage.

45.2 An employee who elects to receive individual medical coverage must notify their appointing authority not less than two weeks notice of their intention to retire.

45.3 An employee who elects to receive individual medical care coverage shall receive basic individual Blue Cross Plan 100 and major medical or its equivalent. If an employee retires under this provision prior to reaching age sixty-five, in that event, when such an employee reaches age 65, they shall receive individual plan sixty-five or its equivalent. If an employee has already reached age sixty-five and elects to receive individual medical coverage under the provision, they shall receive individual plan sixty-five or its equivalent.

45.4 An employee who elects individual medical coverage under this provision may elect to purchase medical coverage for the family at their expense at the group rate.

45.5 Present employees who have at least thirty years of service and who are not covered under the provisions of FICA and are therefore not entitled to medicare supplement shall continue to receive medical coverage and the State shall pay ninety percent of the cost. When such employee reaches the age of sixty-five, the State agrees to pay one hundred percent of the premium.

45.6 The following formula will be used for paying the cost of individual coverage for employees who retire:

| Years of Service | Age | State's Share | Employee's Share |
|---|---|---|---|
| 10-15 | 60 | 50% | 50% |
| 16-22 | 60 | 70% | 30% |
| 23-27 | 60 | 80% | 20% |
| 28+ | -- | 90% | 10% |
| 28+ | 60 | 100% | 0% |
| 35+ | Any | 100% | 0% |

45.7 At Age sixty-five, upon reaching eligibility for Medicare supplement, the formula shall be increased as follows:

| Years of Service | Age | State's Share | Employee's Share |
|---|---|---|---|
| 10-15 | 65+ | 50% | 50% |
| 16-19 | | 70% | 30% |
| 20-27 | | 90% | 10% |
| 28+ | | 100% | 0% |

CBA, Art. 45.

R.I. Gen. Laws § 36-8-1, et seq., delineates the administration of the retirement system for public officers and employees of Rhode Island. Prior to October 1, 2008, §§ 36-10-2 (Retirement System – Contributions and Benefits) and 36-12-4 (Insurance Benefits) outlined the law with respect to the State's obligations to contribute to retiree health benefits.

Section 36-12-4(b) (1997) provided the matrix of age and service requirements for employees to become eligible for state contribution:

[e]mployees who retire subsequent to July 1, 1989, from active service of the state, and who were employees of the state as determined by the retirement board under § 36-8-1, shall be entitled to receive for himself or herself a retiree health care insurance benefit as described in § 36-12-1 in accordance with the following formula:

| Years of Service | Age | State's Share | Employee's Share |
|---|---|---|---|
| 10-15 | 60 | 50% | 50% |
| 16-22 | 60 | 70% | 30% |
| 23-27 | 60 | 80% | 20% |
| 28+ | -- | 90% | 10% |

| 28+ | 60  | 100% | 0% |
| 35+ | any | 100% | 0% |

R.I. Gen. Laws § 36-12-4(b) (1997).

This mirrors the schedule that can be found in Article 45 of the CBA.  The scheme prior to the enactment of Article 4 is notable in two major respects.  First, it provided retiree health benefits with state contributions that ranged between 50 - 100%.  Second, for those with over 28 years of service, there was no minimum age requirement to retire.  The parties agree that although not specifically provided for in either the statute or the CBA, retirees who receive 90% state subsidy because they retired prior to age 60 (so-called "early retirees"), upon reaching age 60 receive a post-retirement boon that increases their subsidy to 100% state subsidy.

After oral argument and while this case was under advisement, the Court requested the parties specify the language providing for this post-retirement benefit to early-retirees who attain age 60.  The parties responses, remarkably, indicate that no such language actually exists, rather "[t]here is no dispute that these two lines [in Article 45 of the CBA] have always been interpreted by both parties one way – for early retirees a shift would take place – if the early retiree was any age and had 28+ years, he or she would receive a 90 percent subsidy at retirement.  Exhibit A.  However, once that retiree reached the

6

age of 60, that subsidy would increase to 100 percent."[4]  (Pls.'
Supp. Mem. 3 (emphasis in original).)  A similar post-retirement
change, one contained in the CBA and the statute, also occurs
once a retiree reaches the age that Medicare supplement would be
available (65).  See R.I. Gen. Laws § 36-12-4(c)(1997).

**B.   Article 4 and the new retiree health benefit scheme.**

Article 4, which is set forth in relevant part below,
essentially froze the current rate of state contributions for
retirees currently receiving health benefits (i.e. those who
retired before October 1, 2008).  As a result, Article 4 also
effectively eliminated the post-retirement boon for early
retirees who attain age 60 (whereas the post-retirement change
upon attaining the age of Medicare supplement (65) remains

---

[4] Defendants agree that Article 4 eliminates this benefit
for all early retirees but argue that Council 94 lacks standing
to raise this issue because no member of the Union or individual
Plaintiff occupied this position prior to May 2008.  However,
because the Court has already determined that October 2008 is
the critical date demarcating the point when the benefit scheme
changed, and because Cindy Paquin is a named plaintiff and an
early retiree who retired days before Article 4's effective
date, the Court will consider the impact of Article 4 on her
situation.  That said, it does not appear that Council 94, at
the time of the filing of this action, nor any of the individual
Plaintiffs, represent early retirees who retired prior to the
expiration of the CBA on June 30, 2008.  Thus, Council 94 lacks
standing to pursue the claims of early retirees who retired at
the time a valid CBA existed (the significance of which is
further discussed in Part III).  Although some discussion of
that group is necessary to explain the Court's holding, whether
those individuals have a contractual right to retain an increase
in benefit at age 60 is not properly before this Court at this
time.

untouched).   Article 4 includes a new set of age and service criteria for state employees who retire on or after October 1, 2008, and a new rate of 80% state contribution across the board for those employees.

Section 36-12-4 (LexisNexis Supp. 2009) now provides,

(b) State employees who retire subsequent to July 1, 1989, and on or before September 30, 2008. Employees who retire subsequent to July 1, 1989, and on or before September 30, 2008, from active service of the state, and who were employees of the state as determined by the retirement board under § 36-8-1, shall be entitled to receive for himself or herself a retiree health care insurance benefit as described in § 36-12-1 in accordance with the following formula:

| Years of Service | Age at Retirement | State's Share | Employee's Share |
|---|---|---|---|
| 10-15 | 60 | 50% | 50% |
| 16-22 | 60 | 70% | 30% |
| 23-27 | 60 | 80% | 20% |
| 28+ | -- | 90% | 10% |
| 28+ | 60 | 100% | 0% |
| 35+ | any | 100% | 0% |

If the retired employee is receiving a subsidy on September 30, 2008, the state will continue to pay the same subsidy share until the retiree attains age sixty-five (65).

When the retiree reaches that age which will qualify him or her for Medicare supplement the formula shall be:

| Years of Service | State's Share | Employee's Share |
|---|---|---|
| 10-15 | 50% | 50% |
| 16-19 | 70% | 30% |
| 20-27 | 90% | 10% |
| 28+ | 100% | 0% |

*     *     *

> (d) State employees who retire on or after October 1, 2008. Employees who retire on or after October 1, 2008 from active service of the state . . . who have a minimum of twenty (20) years of service, and who are a minimum of fifty-nine (59) years of age, shall be entitled to receive for himself or herself a retiree health care insurance benefit as described in § 36-12-1. The State will subsidize 80% of the cost of the health insurance plan for individual coverage in which the retired state employee is enrolled in. Payments of any retired employee for coverage shall be deducted from his or her retirement allowance and remitted from time to time in payment for such contract.

R.I. Gen. Laws § 36-12-4(b) (LexisNexis Supp. 2009).

Thus, in the new statutory scheme, the operative age that determines the level of benefits for employees who retired prior to September 30, 2008, is the "Age at Retirement." R.I. Gen. Laws § 36-12-4(b) (LexisNexis Supp. 2009). Furthermore, for those same retired employees "the state will continue to pay the same subsidy share until . . . sixty-five (65)[,]" meaning that the state will no longer increase their benefits when they reach sixty. Id. (emphasis added). Employees who retire after October 1, 2008, with twenty years of service and who reach age fifty-nine, are now eligible for a 80% subsidy.

## C. Where Plaintiffs fit in relation to the change in the reimbursement scheme.

Council 94 has brought this action on behalf of its members (current employees represented by the Union) along with several current and past individual state employees who have been (or

will be) affected by the change in the retiree benefit payments. As noted in footnote 4, Council 94 does not purport to represent, and no individual named plaintiff is, an early retiree who retired prior to the expiration of the CBA on June 30, 2008. As it stands, employees who retired, or did not retire, may be affected differently as their benefit expectations, both before and after the enactment of Article 4, changed. The question to be answered in this litigation is whether the various groups of employees have certain rights and expectations that are binding upon the State notwithstanding the enactment of Article 4.

The first group of employees is represented by the individual Plaintiff Cindy Paquin. She states in her affidavit that she retired earlier than she intended because she "felt compelled to retire to preserve the level of retiree benefits available." (Doc. 16-5.) Specifically, Paquin retired at 51 years old with 31 years of service on September 27, 2008. As a result, she was eligible to have the State contribute 90% toward the cost of her retiree health benefits from the date of her retirement. Paquin argues that upon reaching sixty years of age, the State would have been required to contribute 100% under the old scheme; however, she claims her benefits are now frozen at the 90% state contribution until she is 65 years old (when she becomes Medicare-eligible). If Paquin had waited to retire

until after September 30, 2008, the State contribution would have been reduced to 80%, until she reached 65 years old.  As it stands, Paquin claims that she is entitled to the adjustment from 90% up to 100% when she reaches age 60.

Plaintiff Linda Loveday represents the second group of employees, those who did not retire before the effective date of the new statute, but who had accumulated enough years of service and age to do so.  She was 56 years old and had completed 29 years of service prior to October 1, 2008.  If Loveday had retired prior to September 30, 2008, she would have had 90% of her retiree health benefits covered by the State, just like Paquin; however, Loveday chose not to retire and, as a result, under the current scheme she is only eligible to receive a maximum state contribution of 80% if and when she retires prior to age 65.

Plaintiff Nancy Carinha is a current employee of the state who, on September 30, 2008, was 40 years old, with 18 years of service who represents a third group of empoyees.  Pursuant to Article 4, Carinha must work until she reaches age 59, after which she will be eligible to receive 80% state contribution toward her retiree health benefits.  Under the old scheme, she could have retired at age 50 (with 28 years of service) with a 90% retiree health benefit contribution from the State.

Both Loveday and Carinha represent the vast majority of Council 94 members affected by the change.  They are current employees who were eligible to retire early under the old Article 4 and the old CBA after attaining 28 years of service (or would have become eligible at some future point if the law had not changed), and would have had their reimbursement increase from 90% to 100% upon reaching the age of 60.  Now, such employees are locked into the 80% reimbursement from the age of retirement (at 59 years old) until they reach age 65, when Medicare kicks in and they become eligible to receive 100% coverage.[5]

## II.  Standard of Review

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  In reviewing a grant of summary judgment, the court "constru[es] the record in the light most favorable to the nonmovant and resolv[es] all reasonable inferences in the party's favor."  Meuser v. Fed. Express Corp.,

---

[5] As mentioned above in footnote 4, there is potentially a fourth group whose members are not represented by either Council 94 or the individual Plaintiffs above.  These are the early-retirees who retired prior to the expiration of the CBA in June.  Their benefits are also frozen per Article 4, although they may have had an expectation that upon attaining age 60 the benefits would increase to 100%.  As Defendants note in their brief, Council 94 lacks standing to bring the claims of this group because they are not members of the Union, nor were they members at the time this suit was filed.

564 F.3d 507, 515 (1st Cir. 2009) (quoting Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002)).

Here, the parties have filed cross-motions for summary judgment on the majority of claims.[6]  In this situation, "cross motions for summary judgment neither dilutes nor distorts this standard of review. . . . All facts, and all reasonable inferences therefrom, are reviewed in the light most favorable to the respective non-moving parties . . . . Cross motions simply require the Court to determine if either party deserves judgment as a matter of law on the undisputed facts." Wagenmaker v. Amica Mut. Ins. Co., 601 F. Supp. 2d 411, 416 (D.R.I. 2009) (internal quotation marks and citation omitted).

Before turning to the central claims of the Plaintiffs, the alleged Contract Clause violation, there is a threshold defense that should be discussed.  "In broad terms, the Eleventh Amendment immunizes a State defendant from actions brought against it in federal court."[7]  Hauser v. R.I. Dep't of

---

[6] Plaintiffs curiously (and inconsistently) argue that they are entitled to summary judgment on their estoppel/unjust enrichment claims while objecting to Defendants' motion on the basis that genuine issues of material fact remain.  However, as set forth in Section III, C below the Court finds such claims are resolvable under Rule 56 as a matter of law.

[7] As mentioned above, Plaintiffs assert claims against the State of Rhode Island, Governor Carcieri, Jerome Williams, and General Treasurer Frank Caprio, in their official capacities as state officials.  As the Court has stated, "a suit against a state official in his or her official capacity is not a suit

Corrections, 640 F. Supp. 2d 143, 147 n.4 (D.R.I. 2009) (citations omitted). However, because Eleventh Amendment issues may be addressed after reaching the merits of the case, Parella v. Ret. Bd. of the Rhode Island Employees' Ret. Sys., 173 F.3d 46 (1st Cir. 1999) it may be appropriate (and practical) in certain cases for the Court to defer consideration of this question. This is just such a case.

## III. Analysis

### A.   Article 4 and the Contract Clauses

Plaintiffs argue that Article 4 substantially impairs the State's contractual obligations to Plaintiffs. Because the Rhode Island Constitution's Contract Clause provides the same protection as its Federal counterpart, R.I. Bd. of Corr. Officers v. Rhode Island ("RIBCO"), 264 F. Supp. 2d 87, 92 (D.R.I. 2003), the Court will consider the claims together. The test for determining whether a law unconstitutionally impairs a contract has four steps: (1) whether a contract exists; (2) whether the law impairs an obligation under the contract; (3) whether that impairment is substantial; and (4) whether that impairment, albeit substantial, is nevertheless reasonable and necessary to fulfill an important public purpose. See McGrath

against the official but rather is a suit against the official's office." R. I. Bhd. of Corr. Officers v. Rhode Island ("RIBCO"), 264 F. Supp. 2d 87, 92 (D.R.I. 2003) (citing Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989)).

v. Rhode Island Ret. Bd., 88 F.3d 12, 16 (1st Cir. 1996).  In
this case the first hurdle is a high one – Plaintiffs must show
that a valid contract existed either through the CBA or by
statute.

### 1.   Is the CBA a Valid Contract?

The CBA is without question a contract negotiated between
the State and the members of Council 94; however, the CBA that
Plaintiffs rely upon (containing the old schedule) was
terminated before the effective date of Article 4.  Plaintiffs
argue, however, that the contract was not (and could not be)
terminated and its terms and conditions continued to have force
and effect beyond its terminal date.  Indeed, Plaintiffs contend
that the obligations undertaken in the CBA for retiree health
benefits were intended to continue beyond the expiration of the
contract itself.   See, e.g., Int'l Union, United Auto.,
Aerospace & Agric. Implement Workers of Am. v. Yard-man, Inc.
("Yard-man"), 716 F.2d 1476 (6th Cir. 1983); United Steelworkers
of Am. v. Textron, Inc., 836 F.2d 6 (1st Cir. 1997).  The Court
will address each of these arguments in turn.

Plaintiffs first argue that the termination of the CBA by
the Governor was not valid, because he was without the right to
unilaterally terminate the agreement.   This position runs
headlong into Article 51 of the CBA, which provides that "[t]his
agreement shall be in force from July 1, 2004 through June 30,

2008" and "[i]n the event that either party desires to terminate this agreement, written notice must be given to the other party not less than ten days prior to the designated termination date." (Doc. 19-1, CBA, Article 51.)

Although Plaintiffs devoted no attention whatsoever to it in their briefs, when questioned at oral argument on this point, they relied upon a Rhode Island Superior Court decision to support their position that the contract continued in force and effect even after its purported termination. See Rhode Island Council 94 v. Carcieri, Decision and Supplemental Decision of the Rhode Island Superior Court, C.A. 08-5073 (Hurst, J.). That decision resulted from a lawsuit filed by Council 94 on August 1, 2008, challenging the validity of an Executive Order signed by Governor Carcieri the day before.

This argument can be easily dispatched. While the Superior Court's decision covers a lot of ground and has a considerable amount of commentary that could be fairly described as dicta, its central holding is really quite narrow. The Court held it "lack[ed] original jurisdiction to determine Council 94's claims for labor-law violations[,]" and deferred the matter to the State Labor Relations Board ("SLRB"). (Decision, Hurst, J., p 17.) And while it is true that the Court issued an injunction against the Governor with respect to implementation of the State's final contract offer, this action can best be understood

as an injunction intended to preserve the status quo pending the SLRB's determination.  See Warwick Sch. Comm. v. Warwick Teachers' Union, 613 A.2d 1273, 1275-76 (R.I. 1992) ("the Superior Court does not have original jurisdiction . . . to determine what, if any, agreement is in force between the committee and the union[,]" however, "as a court of equity, [it] has the power to issue injunctive relief . . . [and] may require that the parties engage in good-faith bargaining").  In such circumstances, the Superior Court, while finding that it lacked subject matter jurisdiction to adjudicate the underlying legal claims (contract clause violations and labor law violations and the like) retained the equitable authority to issue an injunction to preserve the status quo in order to allow the agency charged with dealing with such matters the opportunity to conduct its business.  See id.

Any assertion by the Superior Court with respect to the constitutionality of the governor's actions or the rights and obligations of the parties vis a vis the CBA were merely intended to explain the underlying reasoning of the Court's directive to submit to the SLRB administrative process and nothing more.  In any event, such statements have no binding effect regarding the issues in this proceeding, inasmuch as the underlying claims were neither properly before the Superior Court nor litigated by the parties.

17

So the question remains: did the parties have a valid contractual agreement, and did that agreement live on after its expiration date and the affirmative act of termination by the Governor. There can be no question that the CBA was a valid contract for its duration; however, the State and the Union negotiated a CBA that included a provision for either party to terminate the agreement upon ten days notice. There is no dispute that proper notice was given by the State regarding the termination of the CBA. Cf. RIBCO, 264 F. Supp. 2d at 99 (state defendants enactment of amendment alone constituted adequate notice of termination of CBA).

The effect of the termination simply is that after June 30, 2008, the parties no longer had a contractual relationship with each other. Nonetheless, the State was legally (but not contractually) obligated to maintain the terms and conditions of employment for union members. Although there are "no longer agreed upon terms; the[re] are terms imposed by law, at least so far as there is no unilateral right to change them." Litton Fin. Printing Div. v. Nat'l Labor Relations Bd., 501 U.S. 190, 206 (1991).

It has long been a pillar of labor/management relations law that an employer may not unilaterally change terms and conditions of employment, even post-contract expiration, unless and until the employer has bargained in good faith to impasse

18

with the union.[8]   In the private sector, employers who reach impasse in good faith are entitled to impose their final offer; in the public sector in Rhode Island, however, that option for the most part is foreclosed.  See R.I. Gen. Laws § 36-11-7.1. Thus, a public sector employer in Rhode Island must maintain terms and conditions of employment until a new agreement is reached, or one is imposed as a result of "interest-arbitration."  But see E. Providence Sch. Comm. v. E. Providence Educ. Ass'n, Rhode Island Superior Court, CA 09-1421 (Silverstein, J.) (holding that "§ 16-2-9 [requires that] a school committee must bargain in good faith with certified public school teachers in accordance with Title 28 and honor collective bargaining agreement.  However, under a narrow set of circumstances, when such collective bargaining agreements have reached an impasse and there is no longer a valid collective bargaining agreement, a school committee must comply with the mandate of subsection (d) and avoid maintaining a school budget that results in debt.").

Whatever the rights and obligations, the relationship, post-contract expiration, is not contractual in nature; rather,

---

[8] There are certain exceptions to this rule, none of which apply here.  See, e.g., Providence Journal Co. v. Providence Newspaper Guild, 308 F.3d 129, 132 (1st Cir. 2002) (noting that "[w]hile employers do not have a statutory obligation to continue such dues checkoff once collective bargaining agreements have expired, such obligations may be imposed by contract).

it is essentially a cease-fire imposed by law that must be maintained while the parties progress through a series of dispute resolution procedures.  It is roughly analogous to the landlord and tenant who are at loggerheads after the expiration of a lease.  The landlord cannot simply resort to self-help to immediately remove the tenant; the tenant enjoys certain rights, including the right to remain in the premises until a court issues an eviction notice.

As the United States Supreme Court stated:

an expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied.  Although after expiration most terms and conditions of employment are not subject to unilateral change, in order to protect the statutory right to bargain, those terms and conditions no longer have force by virtue of the contract.

Litton Fin. Printing, 501 U.S. at 206.  The post-expiration obligations to maintain the status quo are rooted in statute and common law and not in contract.  As a result, Plaintiffs cannot establish the first element of a contract clause violation on the back of the terminated CBA alone.  A properly-terminated CBA cannot be the source of Plaintiffs' contractual right, unless, as Plaintiffs argue, the specific provisions pertaining to retiree health benefits were specifically intended for the parties to survive the termination of the contract.  It is to

this question of contract interpretation that the Court now turns.

### 2. Did the Parties intend that certain CBA terms would survive the termination of the CBA?

In certain contracts, such as labor contracts, parties may bargain for rights or obligations to survive the termination of the agreement. In the Yard-man case, for instance, a defendant private company terminated the life and health insurance benefits of its retired employees once the collective bargaining agreement expired. Yard-man, 716 F.2d at 1478. In Yard-man, the Court concluded that the language in the CBA that "[t]he Company will provide insurance benefits" was ambiguous as to whether retired employees had a legitimate expectation that their benefits would continue for the remainder of their lives or only for the life of the CBA. The Sixth Circuit read the language within the context of the entire CBA, and particularly the sections that pertained to health benefits, as affirming that "the parties intended to create nonterminating lifelong insurance benefits for the Yard-man retirees." Id. at 1480; see also United Steelworkers of Am., AFL-CIO v. Newman-Crosby Steel, Inc., 822 F. Supp. 862, 864 (D.R.I. 1993) (CBA provided that the Company "will pay the cost of providing life insurance . . . on the life of each [retired employee]"). As a result, the termination of the life and health insurance benefits of retired

employees by the defendant company, upon the expiration of the CBA, was held a breach of the CBA.  Id.

Yard-man is distinguishable factually from the present case in two important respects:  First, in Yard-man the Court was dealing with a private sector labor contract, not a public sector agreement.  This is important because the content of present and future benefits of State retirees are a function of both contract and statute.  The two work in tandem.  Second, Yard-man involved the termination, or divestment, of retiree health benefits that were currently being received by the affected retirees, whereas here we are dealing with a prospective formula change that will affect employees by freezing the current state contribution for early retirees (the Paquin group) at 90% and changing the formula for the Loveday and Carinha groups to 80%.

More important to the consideration of whether Yard-man applies to the present case though is whether the language of the CBA contemplates a vesting of benefits in employees who have yet to retire.  The question is whether the language of the old CBA itself could reasonably be read as locking-in benefits for employees who either could not (the Carinha group) or chose not (the Loveday group) to retire under the old CBA.  Plaintiffs argue that such benefits are carried forward into the future, even where the terms of the new CBA and the corresponding

statute have changed the benefit scheme.  This is Plaintiffs'
notion of "vesting."[9]  Such a reading of the CBA, however, is
unsupported by the language of the CBA and defies logical
reasoning and fundamental principles of labor relations.

The language in Article 45 of the CBA begins by explaining
that "[t]he State and the Union have agreed that any employee
covered by the contract that retires in accordance with R.I.G.L.
36-8-1 et seq. shall be able to elect to receive employer paid
individual medical coverage."  It further provides that "[t]he
following formula will be used for paying the cost of individual
coverage for employees who retire[.]"  The plain language of the
CBA requires that an employee must take the affirmative step of
retiring in order for the provisions to apply.  Thus, employees
who have not actually retired, even if they meet the age and
service requirements and could retire, cannot rely upon the
expired CBA language to claim a contractual right to the
benefits scheme.  To put it another way, the contract here
provides that an employee is entitled to the retirement benefits
he or she is eligible for, as set forth in the CBA at the time
he or she retires.

Plaintiffs cannot point to any explicit language to support
their contention that benefits "vest" upon reaching the age and

---

[9] Plaintiffs' vesting argument is further discussed, with
respect to the language in the old statute, in Section III, A,
part 4, infra.

service thresholds because there is no such language in the agreement.   Plaintiffs argue that the absence of language specifically reserving a right to amend these provisions supports an "inference" of intent to create a permanent, unalterable obligation.   Indeed, the opposite is true: other language in the CBA signals that the retiree medical benefits negotiated in Article 45 were not intended to remain in effect and unaltered for Plaintiffs even as the contract and law was modified.   For example, Article 15, entitled "Retirement," provides that "[i]t is agreed by the parties hereto that all employees covered by this Agreement shall be the recipients and beneficiaries of all retirement benefits contained in the General Laws of the State of Rhode Island as amended from time to time."  (Emphasis addedd.)  This article implies the opposite of what Plaintiffs contend: that retirement benefits of current employees are subject to change through the legislative process.

Accordingly, it is clear that the CBA is not effective as a contract beyond its termination; that the parties did not intend to extend benefits beyond the contract's term; and that the maintenance of the status quo is driven by statutory and common law, not contract.

There is one more step to the analysis that is necessary to make it complete.   The claim of an alleged "right" to 100% coverage at age 60 is a claim to a future benefit, one that is

not and never has been included in the CBA.  Rather, this bump-up is an undisputed past practice, a tradition of sorts, unmoored to any written document, contractual or statutory. Thus, Plaintiffs make an alternative plea – that the contractual right breached by the State is the agreement enshrined in this past practice of the parties, which is incorporated into the CBA by operation of law.  Defendants do not dispute the existence of the past practice; rather, they claim the practice, like all of the written terms of the contract, was terminated by the State's notice of termination.

Plaintiffs primarily rely upon N. Providence Sch. Comm. v. N. Providence Fed'n of Teachers, Local 920, Am. Fed'n of Teachers, 945 A.2d 339 (R.I. 2008).  See also R.I. Gen. Laws § 28-9-27.  In N. Providence Sch. Comm., the school committee eliminated the composition period for English teachers, which was a fifty-minute block of time assigned to teachers on three to four days a week, giving them "time in which to correct papers and work individually with students on the development of their writing skills."  Id. at 341.  "The union's principal contention was that the composition period amounted to a past practice and that its elimination violated the 'savings clause' found in Article XIII of the collective bargaining agreement." Id. at 342.  The savings clause provided that "[a]ll existing benefits, practices and policies not covered by this agreement

shall continue in effect unless changed by mutual consent of the parties." Id. at 342 n.4.

In contrast to N. Providence Sch. Comm., the CBA between the State and Council 94 does not contain a "savings clause." Indeed, the CBA in this case contains what is known in labor relations parlance as a "zipper clause" (or an "Entire Agreement" clause). Usually the effect of the zipper clause, if it is properly worded and negotiated, is to "avoid the implication of contractual rights." Commc'n Workers of Am. AFL-CIO, Local 1051 v. N.L.R.B., 644 F.2d 923, 928 (1st Cir. 1981).

Here, however, the State appears to concede the argument where it agrees that "administrative interpretation resulted in the policy of increasing State contributions to retirement health benefits when retirees turned 60." (Defs.' Supp. Mem. 9, Doc. 32.) And even after the Court issued an invitation to brief the question of the source of the alleged right, did not present any legal argument that this is not a binding past practice. This leaves matters in a bit of a murky state with the State conceding that the bump-up to 100% was a contractual right (by past practice) but that it is no longer binding (because the contract was terminated). The question becomes, to the extent that this practice was effectively binding on the parties, was it was terminated along with the rest of the CBA terms?

The right of either party to terminate the CBA is embodied in the CBA itself, as detailed above.  And as discussed, there is no question that the State complied with the notice requirement.  Plaintiffs would have the Court hold that even if the CBA was terminated, the past practice lives on as a kind of mini-contract, unaffected by the termination.  Just as with the vesting argument, this contention defies both logic and law.  All of the analysis set forth above applies with equal force to contractual terms that are specifically written into the CBA and those that exist only in the form of binding past practices, whatever they may be.  Of course, just as the State must maintain the status quo with respect to the terms of the CBA after termination pending negotiation of a new CBA, the State presumably must maintain the status quo on these practices as well.  But as discussed above this maintenance of the status quo is not contractual, but rather an obligation imposed by law.  The bottom line then is that Plaintiffs had a contractual right in the form of a binding past practice, but this right was terminated with the rest of the CBA.

For these reasons, Plaintiffs have failed to establish that the terminated CBA provides a basis for a contract right at the operative time, i.e., the effective date of Article 4, entitled to constitutional protection.

### 3.   Is the Statute a Contract?

Plaintiffs' burden with respect to the claim that a contractual obligation has been created by statute is even greater, because "there is a strong presumption against interpreting statutes as contractual agreements." Nat'l Educ. Ass'n-Rhode Island v. Ret. Bd. of the Rhode Island Employees' Ret. Sys. ("NEA I"), 890 F. Supp. 1143, 1151 (D.R.I. 1995). Indeed, "normally state statutory enactments do not of their own force create a contract with those whom the statute benefits" because the potential "constraint on subsequent legislatures" is so significant. Parella v. Ret. Bd. of the Rhode Island Employees' Ret. Sys., 173 F.3d 46, 60 (1st Cir. 1999) (quoting Hoffman v. City of Warwick, 909 F.2d 608, 614 (1st Cir. 1990)). To overcome this presumption against contract creation, Plaintiffs must show that the legislature "clearly and unequivocally" intended to grant the statutory pension benefits as contractual rights. RIBCO, 264 F. Supp. 2d at 87. This view has previously been rejected by this Court and the First Circuit in another context: "we do not think that the Rhode Island general pension statute 'clearly and unequivocally' contracts for future benefits . . . [n]owhere does the statute call the pension plan a 'contract' or contain an 'anti-retroactivity clause' as to future changes." Nat'l Educ. Ass'n-Rhode Island ex rel. v. Ret. Bd. of the Rhode Island Employees' Ret. Sys.,

172 F.3d 22, 28 (1st Cir. 1999) ("NEA II"). Plaintiffs here make the same argument rejected in NEA II.

The unmistakability doctrine, as its name suggests, requires that a statute must be unmistakably clear on this point and "[t]he party asserting the creation of a statutory contract must prove that the legislation is 'intended to create private contractual or vested rights' and not merely declaratory of 'a policy to be pursued until the legislature . . . ordains otherwise.'" NEA I at 1151-52 (quoting Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. 451, 466 (1985)). The Court must discern the intent of the legislature through analysis of the language of the statute and the circumstances of the party claiming the contractual right. "Such circumstances, by their nature, will vary from case to case. Particular plaintiffs bringing particular Contract Clause claims . . . may find themselves in markedly different circumstances." Parella, 173 F.3d at 61.

In order to create a contractual obligation via statute the law demands that there must be no ambiguity in what the legislature intends. This makes sense given that such a finding would limit future lawmakers' ability to respond to pressing circumstances such as a fiscal crisis. Plaintiffs argue that certain phrases in the statute such as "shall be entitled to receive . . . in accordance with the following formula[,]"

"providing for" retiree benefits, and "to determine the required amount to maintain this benefit in effect[,]" are evidence of the legislature's intent to create a contractual right. Plaintiffs also point to contributions that were made toward retiree health benefits from 1989-1990 (which were discontinued and returned to employees), and the general contributions by employees made toward their pension benefits, as evidence of contract.  All of Plaintiffs' piecemeal evidence falls woefully short of establishing an unmistakable intent on the part of the General Assembly to create a contract.  The statutory language here, which mentions neither "contracts" nor "contractual obligations," comes nowhere close to meeting that strict standard.

### 4.   Have the benefits "vested" into a unilateral contract?

Plaintiffs attempt to do sidestep around their difficult burden by arguing that retiree health benefits "vested"[10] in employees and retirees; in this way Plaintiffs attempt to shift the burden back to the State by arguing that without "a clear reservation of power, . . . [the State may not] terminate benefits that would otherwise be considered vested."  See Emerling v. Village of Hamburg, 255 A.D.2d 960 (N.Y.A.D. 1998).

---

[10] Black's Law Dictionary defines 'vest' to mean "To confer ownership of (property) upon a person.  2. To invest (a person) with the full title to property.  3. To give (a person) an immediate, fixed right of present or future enjoyment."

By claiming the benefits have vested in the various Plaintiff employees, Plaintiffs are essentially arguing that a unilateral contract was created between the State and each individual employee. This vesting argument falls short as well. First, it is by no means clear that the pension case law and the particular concept of "vesting" relied upon by Plaintiffs, has any application at all to the health benefits at issue here. Defendants persuasively argue that health care benefits are more akin to the reemployment benefits in Retired Adjunct Professors of the State of R.I. v. Almond, 690 A.2d 1342 (R.I. 1997), and may as such, be altered at any time.

In Retired Adjunct Professors, the retirees initially were able to be reemployed by the State for up to 75 full or 150 half days before their pension payments would be suspended. The General Assembly changed the law to prohibit such reemployment unless the retirees' benefits were suspended during the period of employment. Id. at 1345. The Rhode Island Supreme Court reversed a lower court ruling that applied NEA I, 890 F. Supp. 1143, holding that there were no contractual rights to "reemployment opportunities." Retired Adjunct Professors 690 A.2d at 1344-45. The Supreme Court reasoned that "post-retirement reemployment with the State is always optional with both parties: the State is not obliged to offer it, and the

retirees are not obliged to accept it if it is offered." Id. at 1345.

More recently, in Arena v. City of Providence, 919 A.2d 379 (R.I. 2007), the Rhode Island Supreme Court considered the claims of municipal firefighters and police officers who retired after their CBAs expired, but while an ordinance was in place that granted retirees a five percent cost of living allowance ("COLA") benefit each year. Id. at 392-393. The Court noted that the expired CBA was not the source of the retirees COLA benefits and turned to the language of the ordinance instead. Id. The COLA benefit was clearly contained in the ordinance, but, the Court noted, the ordinance did not classify whether it was a mere gratuity or "a vital part of their retirement allowance." Id. at 394, 395. The Court concluded that the COLA was a vested pension benefit, while "acknowledg[ing] that the city has broad discretion to prospectively change the pension benefit plan for firefighters and police officers who have not yet retired." Id. at 393 (emphasis original).

Assuming for the moment, as Plaintiffs contend, that these vesting cases apply in the health benefit context (which is by no means clear), Plaintiffs argument nevertheless fails to persuade. Plaintiffs argue in a sweeping fashion that rights to retiree health benefits crystallize as part of a unilateral contract and vest at some point in time during the employee-

employer relationship.  According to Plaintiffs, this happens: (1) once an offer of employment is accepted; (2) once the age and/or service requirements are met; or (3) upon retirement. Plaintiffs are partially correct in their description of when a right to a benefit may vest in the abstract.  But as applied to the specific groups of employees represented by Paquin, Loveday, and Carinha, Plaintiffs argument misses the target.

To begin, the First Circuit has explained that the terms "'vesting' and 'contractual' are not synonymous" and "[w]hether a plan affords contractual protections against a change in its terms is a different question [from whether a benefit has vested]."  172 F.3d at 26, 28.  The Court has said "[o]ften, such plans have "vesting" provisions, but strictly speaking such provisions usually describe how the existing plan operates and not whether the plan itself can be altered unilaterally by the employer."  Id. at 26.

The case law with respect to this issue is murky at best. In Parker v. Wakelin, 123 F.3d 1, 6 (1st Cir. 1997), the First Circuit considered the constitutionality of statutory amendments to Maine's public pension plan.  The District Court held that certain amendments, which affected a group of non-retired employees who had completed the service requirements (so that they were in a position to retire if they chose to do so), violated the Contract Clause.  Id. at 1.  The First Circuit

reversed, holding there was no unmistakable intent on the part of the legislature to be bound until the pension was actually receivable, i.e., until the employees actually retired.  Id.; but see RIBCO, 264 F. Supp. 2d at 98 (stating in dicta that "once the age and service requirements of a pension plan have been met, the employee's rights vest and cannot be altered").

A fair reading of Parker suggests that there is no bright line for when it becomes impermissible for a public employer to legislatively alter benefits with respect to those who retired under a later-repealed statute.  After considering various theoretical approaches, the Court "eschewed participating in abstract contract theory in favor of performing a close analysis of the statutory provision at issue."  Parker, 123 F.3d at 7.

This Court's charge then is to examine carefully the statutory language at the center of Plaintiffs' claim.  See NEA II, 172 F.3d at 29.  While "[t]he existence of an employer-employee relationship does weigh in favor of finding an implied contract," it is ultimately the statute's actual language that must evince whether or not a contract formed upon acceptance of employment, upon meeting service requirements, or upon retiring. See id. at 28.  The Parker Court reasoned that "as a general matter, pensions are viewed as a 'species of unilateral contracts,' although there is considerable disagreement as to when rights in public pension plans vest, if at all."  Parker,

123 F.3d at 7 (emphasis in original) (citing McGrath, 88 F.3d at 17).  In Parker the Court concluded "[t]he statutory language is the primary focus of the inquiry[,]" and drew the line at the point of retirement.[11]  Id. at 8-9. (stating that "[w]e need not decide whether the statute ever gives rise to a contractual relationship; it is enough to say that it does not clearly do so before a teacher retires").  This approach is consistent with the analysis performed by the Rhode Island Supreme Court in Arena.  919 A.2d 379, 393.

A close and careful reading of the pre-amendment statute here does not demonstrate an intent on the part of the General Assembly to lock-in or vest the benefits in employees who are ineligible to retire (the Carinha group), or who have met the age and service requirements, but chose not retire (the Loveday group).  As active employees represented by Council 94, these individuals continued to be governed by the give and take of the collective bargaining process.  A process which has inherent risks and benefits - the benefits for bargaining unit employees may increase in some respects, or decrease in others.

---

[11]  The Court continued to apply this approach two years later in Nat'l Educ. Ass'n-Rhode Island ex rel. v. Ret. Bd. of the Rhode Island Employees' Ret. Sys., (NEA II) 172 F.3d 22 (1st Cir. 1999) (NEA II), where it stated, "[i]n all events, the clear statement rule is binding unless and until altered by the Supreme Court; and the conundrum of a 'statutory' contract that may meet this requirement by clear implication rather than clear language is an issue happily deferred." NEA II, 172 F.3d at 29 (citations omitted).

Nothing in the statutory language can be fairly read to suggest that once an employee is either hired, or reaches the age and service requirement, he or she locks-in to a benefit level that acts as a floor, below which he or she can never go as a result of contract negotiations, and/or changes in the law. As a practical matter, however, it is highly unlikely that a change in a benefit scheme that is mirrored in the General Laws will come about first in the CBA.  Rather, as in this case, it is more probable that the legislative change will precede the negotiated CBA change.  And this is precisely the point with the statutory language found here: as long as the employee is in the bargaining unit and subject to the give and take of the negotiated benefit changes through collective bargaining, benefits – even those mirrored in corresponding statutes – may go up or down; they do not forever lock-in at any particular point before retirement.

The question is somewhat closer with regard to the Paquin group, the early retirees who retired under the old statute (prior to October 1, 2008, but after the CBA terminated on June 30, 2008).  Yet these employees too have no vested right to the post-retirement bump-up at age 60.  While this bump-up may indisputably have been the "practice" under the old statute, the parties admit that there is no language in the statute that required it, and the analysis above makes clear that it cannot

be reasonably inferred from the absence of such language that the legislature unmistakably intended to limit the parties' ability to alter that "practice."

Plaintiffs argue that the formula chart in the pre-amendment statute contains the word "Age" and should be interpreted to mean that the benefit applied at the present age of the retiree, whenever he or she attained it. Article 4 now clarifies that the "Age at Retirement" is what is relevant for determining benefit eligibility. In this regard, this situation is similar to Arena where the original ordinance did not classify the COLA benefit as a voluntary gratuity, whereas the revised ordinances did. Arena, 919 A.2d at 393. However, unlike Arena, where the COLA benefit was explicitly provided for, this post-retirement bump-up at age 60 is not in the statute at all.

Moreover, the Paquin group, it must be remembered, retired after the old CBA expired, but before the law was changed. For the reasons outlined above in Section III, parts 1 and 2, it is clear the CBA was terminated on June 30, 2008, and the maintenance of the status quo is not contractual, but is an obligation arising out of state labor relations law. Therefore, the only way the Paquin group can "vest" is through the statutory route, not the contract route, and the language of the

statute simply cannot support their claim under the careful reading required by Parker.[12]

Moreover, the legislature is certainly aware of how to provide for such a post-retirement benefit if it wants to do so. After all, the increase in post-retirement benefit that occurs at age 65 is clearly delineated in the statute. The age 60 bump-up, however, exists only as a matter of inference and practice, and this Court cannot and will not "rewrite the law, add to it what has been omitted, omit from it what has been inserted, or give it an effect beyond that gathered from the plain and direct import of the terms used[.]" Arena, 919 A.2d at 393 (quoting 16A McQuillin, § 45.13.05 at 102). The statute prior to Article 4 has no terms that support a post-retirement increase at age 60 and the Court finds absolutely no legal basis upon which to infer such a contractual benefit.

**B.   Takings Clause**

The Takings Clause forbids the taking of private property for public use without just compensation. See U.S. Const.

---

[12] This may be contrasted, perhaps, with retirees who are not part of the present action who retired before the expiration date of the CBA. Of course, as is discussed above, had the State effectively utilized the contractual tools available to it (such as the zipper clause) to wipe the slate clean of unwritten past practices such as the age 60 bump-up, even this group would be without any argument. Whether they would be successful in an action arguing the benefit vested under the CBA, and the State is bound to provide it in spite of the statutory change, is not a question before this Court and the Court takes no position on the issue at this time.

amend. V; R.I. Const. art. I, § 16.   Since the Court has concluded that there is no valid contract binding the State of Rhode Island for the prospective retiree health benefits affected by Article 4, Plaintiffs have failed to allege sufficient facts that would support a Takings Clause claim.   In a nutshell, Article 4 "did not deprive plaintiff's Members of a property interest entitling them to Takings Clause protection." RIBCO, 264 F. Supp. 2d at 103.   Therefore, summary judgment must also enter in favor of Defendants on this claim.

### C. Promissory Estoppel and Unjust Enrichment

The Rhode Island Supreme Court considered the application of quasi-contractual theories in public contracts cases in Retired Adjunct Professors, 690 A.2d 1342, 1346.   The Court declared that "notions of promissory estoppel that are routinely applied in private contractual contexts are ill-suited to public-contract-rights analysis."   690 A.2d at 1346 (citing Pineman v. Fallon, 662 F. Supp. 1311, 1316 (D. Conn. 1987) and Pineman v. Oechslin, 488 A.2d 803, 809 (Conn. 1985)). Eloquently, the Court held that Plaintiffs may have relied upon future offers from the State that were codified in statute, however, "they were not entitled to conclude that these provisions were fossilized in legislative amber."   Id. at 1345. In RIBCO, Judge Lagueux, discussing Retired Adjunct Professors noted that "for the professors to believe that the legislature

would never amend nor revoke the provisions was unreasonable." 264 F. Supp. 2d at 104 (citing Retired Adjunct Professors, 690 A.2d at 1345).

Here, Plaintiffs have failed to point to a single material fact that remains disputed. Plaintiffs may have relied upon the statute in their decision-making to either continue their employment or to retire, however, their belief that the statute would never change was unreasonable. Therefore, Plaintiffs promissory estoppel claim must fail as a matter of law.

As with Plaintiffs' claim of promissory estoppel, Plaintiffs' unjust enrichment claim also fails as a matter of law. Plaintiffs have not sufficiently pled facts that support a claim of unjust enrichment, including what benefits they have conferred upon the State. Plaintiffs allude that the State has received some benefit from the general contributions made by Plaintiffs. However, Plaintiffs do not provide any argument as to how employee contributions constitute a benefit that the State keeps, which is inequitable. The reality is that for their pension contributions, Plaintiffs continue to receive pension benefits, in addition to retiree health benefits.

**IV.   Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and Plaintiffs' motion is DENIED.

IT IS SO ORDERED.

ENTER:


_/s/ William E. Smith_
William E. Smith
United States District Judge
Date:  April 13, 2010